1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                     NORTHERN DISTRICT OF CALIFORNIA

10
11   Affinity Labs of Texas, et al.,              No. C 09-4436 CW  (JL)

12              Plaintiffs,
                                                  ORDER DENYING MOTION TO
13       v.                                       COMPEL DEPOSITION (Docket # 148)

14   Apple, Inc,

15              Defendants.
     _____/
16
         **I.      Introduction**
17
             The motion of Plaintiffs Affinity Labs of Texas, et al. to compel the deposition of
18
     Defendant Apple's Chief Executive Officer, Steve Jobs, and Apple's motion for protective
19
     order to prevent the deposition were submitted without oral argument as provided by Civil
20
     Local Rule 7-1(b). All discovery in this case was referred by the district court (Hon. Claudia
21
     Wilken) under 28 U.S.C. §636(b). The Court carefully considered the moving and opposing
22
     papers and the arguments of counsel and hereby denies the motion to compel and grants
23
     the motion for protective order. The Court finds that Affinity not only fails to show that Jobs
24
     possesses unique, personal non-repetitive firsthand knowledge of relevant facts, but also
25
     fails to show that Affinity has exhausted less burdensome means to obtain that information.
26
         **II.     Background**
27
28

United States District Court

For the Northern District of California

1    Affinity is a non-practicing entity ("NPE"), which owns and defends patents and

2    engages primarily in litigation. Apple is high on the list of companies most often sued by

3    NPEs. (Ex. 4 to Glasser Declaration ISO Apple's opposition to motion to compel).

4    Affinity sued Apple in the Eastern District of Texas, alleging willful infringement of

5    U.S. Patent No. 7,187,947, U.S. Patent No. 7,440,772, and U.S. Patent No. 7,486,926

6    (collectively, the "Patents-in-Suit").

7    **A.    Allegations of the Complaint**

8    In its complaint Affinity contends:

9    That Apple's acts of infringement of the '947 Patent include the manufacturing,

10   using, marketing, offering for sale, and/or selling of the iPhone line of products and

11   developing, maintaining, using, marketing, making available, offering to sell and selling

12   software applications for the iPhone line of products through Apple's App Store mobile

13   software application;

14   That Apple's acts of infringement of the '772 Patent include the manufacturing,

15   using, marketing, offering for sale, and/or selling of the iPhone and iPod Touch line of

16   products and developing, maintaining, using, marketing, making available, offering to sell

17   and selling digital audio through the iTunes software application on a personal computer

18   and through the iTunes mobile software application on the iPhone and iPod Touch line of

19   products: and finally,

20   That Apple's acts of infringement of the '926 Patent include manufacturing, using,

21   marketing, offering for sale, and/or selling of the iPod, iPhone and iPod Touch line of

22   products that can be integrated with a separate sound system and developing, maintaining,

23   using, marketing, making available, offering to sell and selling digital audio through the

24   iTunes software application on a personal computer that can be transferred to the iPod,

25   iPhone and iPod Touch line of products.

26   (Complaint, Docket # 1)

27   **B.    Procedural Background**

28

1    In August 2009, the district court in Texas transferred this case to the Northern

2  District of California, finding that

> Apple's headquarters, many of its employees, and a substantial percentage of the
> relevant documents and other evidence in Apple's possession are located in the
> Northern District of California. Although Affinity Labs is a Texas limited liability
> company with all of its own offices, documents, and witnesses located in Texas, no
> evidence – and, at best, only one witness – is found within the boundaries of the
> Eastern District of Texas. Given these facts, the court will grant Apple's motion. This
> case is transferred to the United States District Court for the Northern District of
> California.

(Order at Docket # 30)

The case was assigned to the Hon. Claudia Wilken. Apple filed a motion to stay

pending *inter partes* examination of the patents in suit. (Docket # 49). Although the U.S.

Patent Office has granted Apple's application, Judge Wilken denied the motion to stay (at

Docket # 63), finding that the patent re-examination process may take an average of 36

months and then more if a party appeals, and that the delay would be prejudicial to Affinity.

The parties were referred to private mediation, and a stipulated protective order was

entered. Judge Wilken also denied Affinity's motion to admit evidence of depositions taken

in its lawsuit against BMW, finding that Affinity failed to present evidence that the

deponents would be unavailable for deposition in this case. (Docket # 92).  Judge Wilken

denied Apple's motion to file a first amended answer, affirmative defenses and

counterclaims, on grounds that Apple had failed to satisfy the requirements of FRCP 16.

(Docket # 122).

Discovery was referred to this Court (Docket # 124, 129). The parties had a number

of discovery disputes regarding depositions which this Court handled on an expedited bass,

and Affinity sought discovery from non-parties AT&T Mobility and Facebook, who filed

motions for protective order, which were resolved partly by the parties and partly by this

Court. This motion to compel the deposition of Apple CEO Steven P. Jobs was initially filed

on letter briefs but the Court ordered the parties to submit formal briefing.

**III.    Discovery in Dispute**

**A.    Affinity Notices the Deposition of Apple CEO Steve Jobs**

United States District Court

For the Northern District of California

**1.    Anticipated Testimony**

Plaintiff Affinity Labs of Texas, LLC ("Affinity") seeks an Order compelling a deposition of Steven P. Jobs, CEO of Defendant Apple Inc. Affinity seeks Mr. Jobs' deposition because he has unique, first-hand knowledge of facts that are relevant to the central issues in this case.  Affinity recognizes that Mr. Jobs is the CEO and that Apple would like to shield him under the "apex doctrine."  However, that doctrine does not apply to individuals with firsthand knowledge of relevant information.  Another court in this district addressed this very issue on March 21, 2011, and is requiring Mr. Jobs to sit for a deposition because of his firsthand knowledge of issues in that case. *Apple iPod iTunes Antitrust Litigation*, C.A. No. C05-00037 JW (HRL), D.I. 543 (N.D. Cal. Mar. 21, 2011).

In the present patent infringement case, Affinity accuses Apple's iPhone, iPod, iPad, iTunes Store, iTunes software, and App Store of infringing three Affinity patents that broadly cover these products and date back to March 2000.  Generally, the infringement claims are based on Apple's portable electronic devices (the iPod) and cell phones (the iPhone) that wirelessly download items such as such as music and feature-rich applications.  Accordingly, one of the central issues in this case is the value to Apple of its iTunes Store and App Store - i.e., the value of a patent that fundamentally covers the ability of consumers to wirelessly download music and applications to a portable cell phone or MP3 player.  Another feature is the software in these devices that allow third-party accessories to control them (e.g., a car stereo that can connect to and control an iPod).  Likewise, Apple has asserted that Affinity's patents covering these features are obvious, that these features were not innovative as far back as March 2000.

Affinity argues that Mr. Jobs' public statements about the importance of the technology at issue go to the heart of the damages and patent validity issues.  Mr. Jobs used such phrases as "innovative," "revolutionary," and "ground breaking" to publicly describe iTunes and the App Store and other accused technology in numerous statements, and did so years after Affinity filed its patents. Affinity characterizes these statements as confirming that the patents certainly would not have been obvious at the early date when

1    they were filed.  In addition, Mr. Jobs has made statements about the importance of

2    patents that cover smartphones such as the iPhone, and Apple's views of patents when

3    enforcing its own intellectual property.  He has also provided public commentary about a

4    widely reported $100 million patent license that Apple entered into for a single patent on

5    related technology.  That patent post-dates the Affinity patents and Affinity claims it is

6    objectively less valuable than Affinity's patents.  Apple has told Affinity that it has no

7    documents or analysis of the specific value of any of these claimed features.  Affinity

8    argues that Mr. Jobs has firsthand knowledge of these critical issues, as he is the only

9    witness who actually made the specific statements to the public, and that therefore he

10   should be subject to deposition by Affinity.

11          **2.      Steve Jobs' role at Apple**

12          Apple is a leading provider of personal computers, mobile communication and media

13   devices, and portable digital music players, and it sells a variety of related software,

14   services, peripherals, networking solutions, and third-party digital applications and content.

15   Glasser Declaration, Ex. 1 at 1.  Apple's innovative products are sold in more than 100

16   countries, and Apple employs more than 45,000 people worldwide.  *Id.* at 10.

17          Apple's success has also attracted unwanted attention. Apple is a frequent target for

18   litigation, including patent litigation by non-practicing entities.  PatentFreedom.com-a

19   website devoted to research related to patent enforcement actions-recently identified Apple

20   as the most "relentlessly pursued" operating company by non-practicing entities between

21   2008 and 2010.  Glasser Declaration Ex. 4.  Between 2006 and 2010, Apple was named as

22   a defendant in 70 separate lawsuits filed by non-practicing entities.  *Id.*

23          Mr. Jobs co-founded Apple in 1976 and is now its CEO and a director.  After leaving

24   Apple in 1986, Mr. Jobs returned in 1997 to lead Apple's historic recovery.  As CEO, Mr.

25   Jobs is responsible for the management and oversight of Apple's complex global

26   operations.  Mr. Jobs also co-founded Pixar Animation Studios, which created several of

27   the most successful feature-length animated films of all time, including Toy Story,

28   Monsters, Inc., and The Incredibles.  Ex. 2.  He served as Pixar's CEO from 1986 until

**United States District Court**

For the Northern District of California

1  2006, when Pixar merged with The Walt Disney Company.  Mr. Jobs is now a member of

2  Disney's board of directors and serves on a six-person steering committee that oversees

3  Pixar.  Ex. 3.  His time is a critical asset for Apple and Disney, and he carefully manages

4  his schedule to ensure that he can devote the necessary energy, attention and focus to his

5  duties and responsibilities for the benefit of shareholders, customers and employees.

6      Given his leading roles at Apple and Pixar/Disney, Mr. Jobs has become one of the

7  most recognizable CEOs in the world, and he is regularly quoted regarding Apple and its

8  many product offerings.  For instance, he has historically provided the keynote presentation

9  at the annual Worldwide Developers Conference, which is one method for Apple to

10  showcase its new software and technologies for developers.

11     **B.     The Parties Meet and Confer**

12     Affinity and Apple met and conferred multiple times, but were unable to resolve this

13  issue. Fact discovery in this case closed on March 21, 2011. (Docket # 128). Affinity filed

14  under seal a full motion to compel this deposition on March 24, 2011 (Docket # 147, 148).

15  If the Court orders Mr. Jobs' deposition, Apple will not oppose scheduling it after the close

16  of fact discovery. (Gaudet Decl. ¶24, February 3, 2011 email from Glasser to Gaudet).

17     **C.     Discovery at Issue**

18     **1.     Mr. Jobs' Statements**

19     Affinity seeks to depose Mr. Jobs on these public statements:

20     **(a)     Statements about the accused App Store**

21     "The App Store is a grand slam, with a staggering 10 million applications

22  downloaded in just three days.  Developers have created some extraordinary applications,

23  and the App Store can wirelessly deliver them to every iPhone and iPod touch user

24  instantly." (Gaudet Decl.  8).

25     Describing the App Store as follows:  "This is the biggest launch of my career."

26  (Gaudet Decl.  9).

27     "The App Store revolutionized mobile apps."  (Gaudet Decl.  10).

28

1    "I would now like to talk about the App store for a few minutes.  One area we

2   completely changed the value proposition from mobile devices is the App store.  Customers

3   will download the 200 millionth application from the App store tomorrow.  Only 102 days

4   since its launch on July 11th.  The 200 millionth App.  We've never seen anything like this

5   in our careers.  There are now over 5,500 applications offered on the App store in 62

6   countries around the world, and the rate of new applications being submitted is increasing

7   every week.  Competitors are scrambling to keep our App store, but it's not as easy as it

8   looks, and we are far along in creating the virtuous cycle of cool applications begetting

9   more iPhone sales, thereby creating an even larger market, which will attract even more

10   iPhone software development.  It is clear that customers are not attracted to iPhone

11   if[sic]only for its amazing functionality and revolutionary multi-touch user interface, but also

12   for its unique ability to let users easily purchase, download, and use thousands of different

13   applications, raining[sic] from free games to financial planning and health management.  All

14   of this in only 102 days."  (Gaudet Decl.  11).

15    "These devices need to work, and you can't do that if you load any software on

16   them.  That doesn't mean there's not going to be software to buy that you can load on them

17   coming from us.  It doesn't mean we have to write it all, but it means it has to be more of a

18   controlled environment."  (Gaudet Decl.  12).

19      **(b)     Statements about the accused Wireless Music Store**

20    The Apple press release regarding the Wireless iTunes Store, stating: "With the

21   iTunes Wi-Fi Music Store, music fans can start enjoying their music purchases immediately

22   on their iPod touch or iPhone with no computer required. . .  If users have only partially

23   downloaded a song or album onto their iPod touch or iPhone their computer will complete

24   the download automatically." . . .In the next paragraph, Mr. Jobs states:

25    "The iTunes Wi-Fi Music Store is really fun - you can browse, search, freely preview,

26   buy and instantly download music right onto your iPod touch or iPhone.  Innovative

27   products like this keep iTunes at the forefront of the digital music revolution."  (Gaudet

28   Decl.  13).

      **(c)     Statements about the accused iTunes client software application**

"Wouldn't it be awesome if people could buy high-quality audio tracks via the internet and load them directly into iTunes instead of going to the store to buy CDs to rip?"  (Gaudet Decl.  14).

"For years, the primary technology was the [marking mechanism] inside a CD or a DVD player.  But we became convinced that software was going to be the primary technology, and we're a pretty good software company.  So we developed iTunes."  (Gaudet Decl.  15).

**(d)     Statements about the accused iPod**

"Apple has invented a whole new category of digital music player that lets you put your entire music collection in your pocket and listen to it wherever you go.  Isn't this cool?"  (Gaudet Decl.  14).

"With iPod, listening to music will never be the same again."  (Id.).

**(e)     Statements about the first product that used the allegedly infringing protocol in an iPod that allows an accessory device (such as an automobile stereo) to control a iPod or iPhone**

"One of the next frontiers for a seamless digital music experience is the car.  We all spend a lot of time driving, and now this elegant solution lets iPod users enjoy their entire music collection in their BMW or MINI."  (Gaudet Decl.  16).

"Apple chief executive Steve Jobs called the product a groundbreaking move . . . 'They're pretty ugly and they all require you to take your hands off the steering wheel to control them.  This adapter is really the first big step to marry an iPod to an automobile.'"  (Gaudet Decl.  17).

"Apple and BMW have outpaced the industry around the innovation curve.  This elegant solution enables auto enthusiasts to carry with them and enjoy their entire music collection everywhere they go, heightening their ultimate driving experience."  (Gaudet Decl.  18).

**(f)     Statements about iTunes**

United States District Court

For the Northern District of California

1    "Software is the user experience.  As the iPod and iTunes prove, it has become the

2    driving technology not just of computers but of computer electronics."  (Gaudet Decl.  19).

3    "The mobile phone market - with 1.5 billion subscribers expected worldwide by the

4    end of 2004 - is a phenomenal opportunity to get iTunes in the hands of even more music

5    lovers around the world and we think Motorola is the ideal partner to kick this off."  (Gaudet

6    Decl.  20).

7    **(g)    Statements about the importance of patents in the iPhone marketplace**

8    "We can sit by and watch competitors steal our patented inventions or we can do

9    something about it.  We've decided to do something about it."  (Gaudet Decl.  21).

10   "We think competition is healthy, but competitors should create their own original

11   technology, not steal ours."  (Id.).

12   It is these types of statements - made personally by Mr. Jobs - on which Affinity

13   seeks to depose Mr. Jobs.  Affinity claims it has jumped through a series of hoops with

14   other witnesses at Apple's insistence.  Affinity argues that these witnesses have confirmed

15   a very basic rule of evidence:  the person who makes the statement is the person who has

16   firsthand knowledge of that statement and the facts underlying it, and is therefore the

17   person who should be examined regarding the statement.

18   **2.    Apple claims Affinity has not sought any discovery on seven of the**
**public statements.**

19

20   According to Apple, Affinity has not pursued any discovery related to seven of the 18

21   public statements that form the basis for its request to depose Mr. Jobs.  See Def. Motion

22   at Appx. A; PS3, PS5, PS7-10, and PS14.  Each of these seven statements was published

23   and available to Affinity before it deposed its first Apple witness in this case on January 25,

24   2011.  Id.  Affinity's failure to seek any written or deposition discovery on these seven

25   statements before moving to compel Mr. Jobs' deposition should bar Affinity from deposing

26   Mr. Jobs about those public statements.

27   Courts regularly require interrogatories, requests for admission, and depositions of

28   lower level employees before allowing the deposition of an apex witness.  In *Celerity, Inc.*,

2007 WL 205067, a patent infringement action, defendants claimed plaintiff's corporate

United States District Court

For the Northern District of California

1  officers possessed personal knowledge regarding the chain of title to the patents-in-suit,

2  the decision to acquire certain intellectual property, and the valuation of plaintiff's

3  intellectual property.  *Id.* at *4.  This Court agreed that the acquisition of the intellectual

4  property was a "legitimate" area of inquiry, but it granted plaintiff's motion for protective

5  order because defendants failed to show those executives possessed "unique personal

6  knowledge . . . unavailable from less intrusive discovery, including interrogatories and the

7  depositions of lower-level employees."  *Id.*

8          Similarly, in *Mehmet v. Paypal, Inc.*, 2009 WL 921637, at *2 (N.D. Cal. Apr. 3, 2009),

9  the court granted a protective order barring the depositions of Paypal executives, noting

10  that "[c]ourts generally refuse to allow the immediate deposition of high-level executives,

11  the so-called 'apex deponents,' before the depositions of lower level employees with more

12  intimate knowledge of the case."  And in *First Nat'l Mortgage Co. v. Fed. Realty Inv. Trust*,

13  2007 U.S. Dist. LEXIS 88625, at *6-7 (N.D. Cal. Nov. 19, 2007), the court required that

14  depositions of lower-level employees must first be taken to establish whether there was a

15  need to depose high-level executives.

16          Because it failed to seek any discovery regarding these seven statements, Apple

17  argues that Affinity's Motion to compel should be denied, and Apple's Motion for protective

18  order should be granted with respect to PS3, PS5, PS7-10, and PS14 identified in

19  Appendix A.

20          **3.      Apple's other witnesses**

21          After Apple suggested there were other witnesses who could testify about what Mr.

22  Jobs meant when he made his statements,  Affinity deposed the various "substitute"

23  witnesses Apple identified.  According to Affinity, those witnesses attempted to dilute the

24  importance of this technology and to re-characterize the statements made by Mr. Jobs,

25  confirming the need to depose Mr. Jobs. In fact, those witnesses merely disagreed with

26  Affinity's paraphrasing or interpretation of Jobs' statements, not with the statements

27  themselves.

28

United States District Court

For the Northern District of California

1    Much of this testimony was filed with this Court under seal, as containing highly

2  confidential information. Accordingly, although this Court carefully read all the testimony

3  submitted, it does not repeat it here, nor does it identify the witnesses by name.

4    **a.    Witness A** -

5    During one witness's deposition, Affinity characterized his testimony as discounting

6  Jobs' statements regarding  the first product that used the allegedly infringing protocol to

7  allow an accessory device to control an iPod).  Many of Jobs' statements were part of

8  documents that were on the exhibit list in a jury trial on related patents that Affinity claims to

9  have won in October 2010 in the Eastern District of Texas.  (This is the same trial where

10  witnesses were deposed and Judge Wilken in this case denied Affinity's request to submit

11  the witnesses's deposition testimony as evidence in this case because Affinity failed to

12  show that the witnesses would be unavailable to testify.) That trial was against car

13  manufacturers  that offered iPod and iPhone adapters that allowed car users (BMW and

14  Mini) to play and control their Apple devices through their car stereos.  (Gaudet Decl.  27).

15  In those statements, Mr. Jobs referred to this technology as "groundbreaking" (among

16  other laudatory statements), described the " innovative" nature of the BMW iPod adapter

17  (which was the first iPod accessory product to make use of the accused functionality), and

18  specifically criticized the prior art in this area.  To demonstrate the high probative value of

19  such statements, the Court in the Eastern District of Texas trial specifically cited these

20  types of statements as strong evidence supporting the jury verdict of non-obviousness in

21  denying defendants' JMOLs following the jury verdict.  (Gaudet Decl.  28).   Indeed, one

22  defendant who settled just before trial put Mr. Jobs on their "may call list" for live trial

23  testimony.  (Gaudet Decl.  29, Ex. B to Pretrial Order).

24    The witness was therefore examined on the following three sets of statements by

25  Mr. Jobs:

26    **6/21/04 Press Release:**  "Apple and BMW have outpaced the industry around the

27  innovation curve," said Steve Jobs, Apple CEO.  "This elegant solution enables auto

28

1  enthusiasts to carry with them and enjoy their entire music collection everywhere they go,

2  heightening their ultimate driving experience."  (Gaudet Decl.  18).

3      **6/23/04 Australian IT**:  "Apple chief executive Steve Jobs called the product a

4  groundbreaking move - one he hopes will lead to more integrated products between the

5  auto industry and Apple's hot-selling iPod portable music player.  Current iPod owners

6  usually resort to third-party products, ranging from FM transmitters and cassette adaptors,

7  to use their iPods in their cars.  'They're pretty ugly and they all require you to take your

8  hands off the steering wheel to control them,' Mr. Jobs said in an interview. 'This adapter is

9  really the first big step to marry an, iPod to an automobile.'"  (Gaudet Decl.  17).

10     **6/24/04 Canadian Automotive Network**:  "'One of the next frontiers for a seamless

11 digital music experience is the car,' said Steve Jobs, Apple's  CEO.  'We all spend a lot of

12 time driving, and now this elegant solution lets iPod users enjoy their entire music collection

13 in their BMW or MINI.'"  (Gaudet Decl.  16).

14     According to Affinity, at his deposition the witness attempted to completely change

15 the meaning of these statements.  Affinity argues that the witness testified that the BMW

16 iPod adapter was neither innovative, groundbreaking, nor the next frontier of anything. In

17 fact, this Court finds that the witness merely disagreed with Affinity's paraphrasing and

18 interpretation of Jobs' statements.

19     Affinity tries to criticize the witness's testimony in two contradictory ways: First it

20 claims that he disagrees with Jobs' statements and then it claims that he didn't hear Jobs

21 make the statements in exactly the same words as Affinity is quoting. The Court finds that

22 this type of quibbling over manufactured differences does not justify deposing Mr. Jobs.

23     **b.     Witness B -**

24     Affinity questioned this witness on  Jobs' public comments on Apple's $100 million

25 patent license with Creative. The Creative agreement involved a patent license in which

26 Apple paid $100 million for a license to an iPod-related patent with a 2001 priority date (i.e.,

27 a year later than Affinity's priority date).  This was the press release about that license:

28         CUPERTINO, California and SINGAPORE - August 23, 2006 - Apple® and Creative
            Technology, Ltd. today announced a broad settlement ending all legal disputes

between the two companies.  Apple will pay Creative $100 million for a paid-up license to use Creative's recently awarded patent in all Apple products.  Apple can recoup a portion of its payment if Creative is successful in licensing this patent to others.  In addition, the companies announced that Creative has joined Apple's "Made for iPod" program and will be announcing their own iPod® accessory products later this year.

"Creative is very fortunate to have been granted this early patent," said Steve Jobs, Apple's CEO.  "This settlement resolves all of our differences with Creative, including the five lawsuits currently pending between the companies, and removes the uncertainty and distraction of prolonged litigation."

(Gaudet Decl.  31).

According to Affinity, the witness by his testimony effectively disavowed the second sentence in the press release. When Affinity confronted the witness with the direct quote from Jobs about the basis for the value of that single patent that the press release identified, according to Affinity, he again attempted a swift retreat (Affinity's characterization) from Mr. Jobs' statements. Then, according to Affinity, the witness finally admitted that his testimony did not even rise to the level of hearsay because he never heard Mr. Jobs say the words that Mr. Lutton was attributing to him.

This Court finds that, in this line of questioning, Affinity tries to induce Witness B to say that Jobs either never told him what he meant by "early," or else told him something different from what Affinity contends Jobs meant by "early," but instead, Witness B testifies that "early" in this press release refers to more than one patent, and not just the patent that Affinity claims is relevant, and also that, since he worked closely with Jobs on drafting the language of the press release, Witness B knew what "early" meant without Jobs' telling him directly, "Hey, this is what I mean by 'early.'"

**c.     Witness C**

Like the other two witnesses, Witness C, according to Affinity, took great pains to "explain away" Mr. Jobs' statement, in a press release that says the following:

With the iTunes Wi-Fi Music Store, music fans can start enjoying their music purchases immediately on their iPod touch or iPhone with no computer required. . . If users have only partially downloaded a song or album onto their iPod touch or iPhone their computer will complete the download automatically.  (Gaudet Decl.  13)

United States District Court

For the Northern District of California

1    In the next paragraph, Jobs stated that "Innovative products like this keep iTunes at

2 the forefront of the digital music revolution." (*Id.*).

3    Affinity interprets Witness C as disputing even brief, straightforward statements

4 made by Mr. Jobs about the App Store, for which Affinity argues the only remedy is to

5 examine the source of the statements, Jobs himself.  In fact, after reading the transcript of

6 his testimony, this Court finds that Witness C is merely pointing out to Affinity that two

7 concepts were presented in two different sentences and that the statement about

8 innovative products refers to products encompassed in the "whole press release."

9    Affinity goes on to point to what it considers to be another example: when discussing

10 the launch of the App Store,  Jobs was quoted as saying "[t]his is the biggest launch of my

11 career."  (Gaudet Decl.  9). Affinity questioned Witness C about this statement in an

12 attempt to elicit a disagreement with the substance of what Jobs was saying. In fact, after

13 reviewing the testimony, this Court finds that the witness is disagreeing with Affinity's

14 interpretation and paraphrasing of Jobs' statement, not Jobs' statement itself.

15    None of these three witnesses contradict Mr. Jobs' statements, rather they merely

16 disagree with Affinity's paraphrasing and interpretation of the statements and resist

17 Affinity's attempts to manipulate and distort their own testimony.

18

19    **4.    Affinity has not shown that Mr. Jobs has unique, non-repetitive,**
      **firsthand knowledge of the remaining 11 statements.**
20

21    **a.    Affinity failed to take written discovery**

22    Affinity argues that it would be entitled to take Mr. Jobs' deposition regardless of the

content of the witnesses's testimony because - by definition - Mr. Jobs has firsthand

23 knowledge about what he meant about his numerous statements on highly relevant, hotly

24 contested issues.  Affinity claims that Apple's witnesses' attempts to explain away and

25 water down Mr. Jobs' statements about these critical issues highlight its need for the

26 deposition.

27

28

**United States District Court**
For the Northern District of California

1      Affinity cannot show that Mr. Jobs has unique, non-repetitive, firsthand knowledge of

2  relevant facts regarding the other 11 public statements or that Affinity has exhausted,

3  without success, less burdensome means to obtain the same information.

4      Affinity's sole support for its claim that Mr. Jobs has unique, non-repetitive, firsthand

5  knowledge is that he must know about the statements because he made them.  Motion at

6  17.  None of the cases cited by Affinity, however, support the broad proposition that the

7  requisite knowledge can be established by public statements alone.  Even if Mr. Jobs has

8  personal knowledge of the years-old statements and even if they were relevant to this case

9  – and as shown below, they are not – Apple's other witnesses testified fully and

10 consistently with the 11 statements on which Affinity's Motion is based.

11     Affinity also failed to serve any written discovery to obtain the information it seeks,

12 thus failing to exhaust less burdensome means to obtain it.  Affinity concedes that it has not

13 served any written discovery on these 11 statements.  Motion at 21, fn7.

14     Written discovery could have provided the information it now allegedly seeks.  For

15 instance, Affinity could have served interrogatories seeking the reasons why Mr. Jobs

16 made the statements and the identification of Apple witness(es) with equal or better

17 personal knowledge of those statements.  And if Affinity needed to confirm that Mr. Jobs

18 made any statements, requests for admissions are far less burdensome than the

19 deposition of Mr. Jobs.  Affinity did not attempt to learn any of those facts through written

20 discovery, as the rule requires, See, e.g., *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366

21 (D.R.I. 1985).

22     Affinity attempts to excuse its failure to pursue written discovery by claiming it

23 deposed Apple's lower-level witnesses near the close of fact discovery and, as a result, it

24 did not have time to serve interrogatories after those depositions were concluded.  Motion

25 at 21, fn. 7.  But most of the statements on which Affinity seeks to depose Mr. Jobs have

26 been known to Affinity for years.  Affinity could have -- and should have under the apex

27 doctrine -- served interrogatories well before the close of fact discovery.  Affinity's delay in

28 taking depositions does not excuse its failure to serve interrogatories.

**United States District Court**
For the Northern District of California

1   When Affinity chose to pursue discovery regarding the public statements, it

2   consistently obtained the information to which it is entitled.  As shown below, Affinity

3   received deposition testimony from other Apple witnesses on the public statements

4   (regardless of relevance) in each of the categories Affinity identifies.  This deposition

5   testimony confirms that Mr. Jobs does not possess any unique or non-repetitive knowledge

6   on relevant topics that justifies his deposition.

7   **b.       Affinity received sufficient testimony regarding Mr. Jobs'
            statements about the release of the BMW iPod Adapter (PS11-13).**

8

9   The statements attributed to Mr. Jobs relating to the 2004 release of BMW's iPod

10   Adapter (PS11-13) are not relevant to any claims at issue in this case.  To support its claim

11   of relevance, Affinity points to Judge Clark's comment following a trial in the Eastern District

12   of Texas that the "buzz" surrounding the introduction of the BMW Adapter weighed in favor

13   of non-obviousness of Affinity's '833 Patent.  Motion at 9-10, fn2-3.  Apple was not a party

14   to that litigation and the '833 Patent is not at issue here.  Unlike the patents at issue in the

15   case before Judge Clark, the patents at issue in this case do not claim an automobile

16   sound system.  Any obviousness analysis must relate to the claims of the Patent-in-Suit.

17   *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004).  In

18   addition, to prove commercial success, which can be an example of secondary

19   considerations of non-obviousness, a "nexus must be established between the merits of

20   the claimed invention and evidence of commercial success before that evidence may

21   become relevant to the issue of obviousness."  *Id.*  Mr. Jobs' statements have nothing to do

22   with the narrow and specific claims of the patents at issue, but instead relate generally to a

23   product released by third party BMW.

24   Even if Mr. Jobs' statements were relevant, Affinity has already obtained complete

25   testimony from Witness A, who confirmed that Jobs does not have unique, non-repetitive

26   knowledge about the statements.  Affinity alleges that Witness A attempted to discount

27   Jobs' statements regarding the innovative nature of BMW's iPod Adapter when he testified.

28   This Court finds that the witness's statements are entirely consistent with those of Mr. Jobs,

United States District Court

For the Northern District of California

1   who was quoted as saying that other, less elegant, solutions existed before the BMW iPod

2   Adapter:

3       They're pretty ugly and they all require you to take your hands off the steering wheel

4       to control them…

5       This adapter is really the first big step to marry an iPod to an automobile.

6   Ex. 27.

7       This case is unlike *Paice, LLC v. Toyota Motor Corp.*, C.A. No. 2:07-CV-180 DF,

8   Dkt. #117 (E.D. Tex. July 21, 2009), an unpublished decision from 5th Circuit in which the

9   plaintiff argued that Toyota witnesses took positions "directly counter to numerous

10  statements made by [executive] Mr. Press."  Witness A's testimony is entirely consistent

11  with Mr. Jobs' statements regarding the BMW iPod Adapter.  Affinity is unable to point to

12  any disavowals or contradictory statements by Witness A suggesting that Mr. Jobs has

13  unique, firsthand knowledge of the statements regarding the release of the BMW iPod

14  Adapter.

15      Attempting to manufacture a conflict where none exists, Affinity states in a footnote

16  that Witness A disagreed with a statement by Mr. Jobs that the iTunes Music Store

17  "revolutionized the way people legally buy music."  Motion at 11-12, fn11.  But Affinity does

18  not identify this statement as one of the 18 on which it seeks to depose Mr. Jobs.  See

19  Appx. A.  And Apple never suggested that Witness A would be an appropriate witness to

20  depose on statements regarding iTunes.  Witness A's responsibilities at Apple have

21  consistently related to Apple's portable products.  Ex. 22 at 12:25-14:2.  Regardless,

22  Witness A did not disagree with the statement; he simply testified that the iTunes and

23  iTunes Music Store personnel were "very hopeful that they could provide, again, a better

24  experience for our customers."  Id. at 45:6-46:1.

25      **c.**       **Affinity received sufficient testimony regarding Mr. Jobs'
                     statement about Apple's settlement with Creative Labs (PS18).**

26

27      Affinity deposed Witness B, regarding a lone public statement about Apple's 2006

28  settlement with Creative Labs:  "Creative is very fortunate to have been granted this early

    patent."  Affinity is incorrect that the settlement with Creative is relevant to this litigation,

1  and it is wrong that Witness B's testimony somehow justifies Affinity taking Mr. Jobs'

2  deposition.

3       Controlling Federal Circuit precedent confirms that the Creative settlement is not

4  relevant to the damages calculus in this case.  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d

5  860, 869 (Fed. Cir. 2010).  In *ResQNet.com*, the court vacated a damages award where

6  the plaintiff's expert relied on prior licenses, some of which had no discernible link to the

7  claimed invention at issue in the dispute between ResQNet.com and Lansa.  *Id.* at 870.

8  Affinity has similarly failed to allege a link between the claims of the patents in this litigation

9  and any rights Apple obtained under the Creative Labs settlement.  The fact that a Creative

10  Labs patent had a priority date after Affinity's does not supply that link because, as Witness

11  B explained, the priority dates say nothing about their respective subject matter.  Ex. 23 at

12  107:16-111:4.  Moreover, as confirmed by Witness B during his deposition, the Creative

13  Labs settlement is not a simple license:  it created a bi-lateral business relationship that

14  resolved five lawsuits between Apple and Creative Labs (significant competitors)

15  and-contrary to Affinity's suggestion-involved literally hundreds of patents.  Ex. 23 at

16  64:14-65:4, 67:16-72:3.  Notably, even Affinity's own damages expert, Walter Bratic, stated

17  in his April 1, 2011 expert report that he did not rely on the Creative Labs settlement in

18  forming his opinions because he did not find it relevant.  Ex. 28, Expert Report of Walter

19  Bratic at 163-66.

20       Regardless, Witness B provided sufficient testimony about the Creative Labs

21  settlement.  He explained, in detail, that the settlement granted Apple, among other things,

22  a broad portfolio license.  Ex. 23 at 64:18-65:4.

23       This case thus differs from the situation in *Kennedy v. Jackson Nat'l Life Ins. Co.*,

24  2010 U.S. Dist LEXIS 47866, at *4-5, *7-8 (N.D. Cal., Apr. 22, 2010), a case cited by

25  Affinity, where a limited deposition of the CEO was permitted because other witnesses

26  identified the CEO as having unique knowledge.  Witness B substantively answered all of

27  Affinity's questions, and he never indicated that Mr. Jobs had unique knowledge that this

28

    

United States District Court

For the Northern District of California

1   witness could not provide. The fact that Witness B may not have provided the answers that

2   Affinity wanted is not a basis to depose Mr. Jobs.  As this Court noted in *Doble*:

> Although Plaintiffs have perhaps not obtained the answers they wanted from lower
> level employees, that failure does not automatically justify their reaching higher,
> without the requisite showing of the higher-level official's unique personal
> knowledge.

*Doble v. Mega Life and Health Ins. Co.*, 2010 WL 1998904 at *4 (N.D.Cal., 2010).

7        **d.         Affinity received sufficient testimony regarding Mr. Jobs'
                     statement about iTunes and iTunes WiFi Music Store (PS6, 15).**

9        Affinity in its Motion does not even try to explain how Mr. Jobs' general statement

10  about the innovative nature of iTunes and the iTunes WiFi Music Store is relevant to this

11  case.  None of the Patents-in-Suit broadly covers these applications.  Instead, the asserted

12  claims – even as broadly construed by Affinity – address specific aspects of cellular phones

13  that perform particularized functions, such as streaming audio to cellular devices or

14  previewing songs on the iTunes Store.  Ex. 9 at A5-6, A11-12, A14-16, A20-28.

15       Affinity's Motion also fails to explain how other witnesses' testimony about these

16  public statements justifies Mr. Jobs' deposition.  Although it argues that Witness C "took

17  great pains to explain away Mr. Jobs' statement," Affinity does not identify any disavowal or

18  contradictory testimony by Witness C.  For instance, Affinity questioned Witness C about a

19  press release regarding, among other things, the iTunes WiFi Music Store and a custom

20  ringtone maker, in which Mr. Jobs stated that "Innovative products like this keep iTunes at

21  the forefront of the digital music revolution."  Ex. 24 at 124:11-127:20. Witness C never

22  testified that he disagreed with Mr. Jobs' statement.  *Id.*  Rather, he correctly noted that

23  because "innovative products" is plural, it likely refers to the Wi-Fi Music Store as well as to

24  other products and features also mentioned in the press release, such as custom ring

25  tones and the added capabilities for watching movies and TV shows.  *Id.* at 124:17-127:20.

26  Even if Witness C's testimony was not sufficient (which it is), Affinity neglects to mention

27  that it also asked another witness the specific question about the WiFi Music Store and

28

United States District Court

For the Northern District of California

1  received a sufficient response, as this Court discerned from its reading of the witness's

2  testimony.

3      And although Affinity contends it needs to depose Mr. Jobs about his statement

4  regarding iTunes (Appx. A; PS15), Affinity's Motion fails to mention that this same witness

5  agreed with Mr. Jobs' statement that the mobile phone market was an opportunity to get

6  iTunes in the hands of music lovers.  Ex. 25 at 176:22-177:15.

7      **e.**          **Affinity received sufficient testimony regarding Mr. Jobs'**
                        **statements about the App Store (PS1, 2, 4).**

8

9      Affinity also accuses Witness C of (1) downplaying Mr. Jobs' statement (PS1) that

10  the App Store was a "grand slam" and (2) disputing Mr. Jobs' "straightforward" comment

11  (PS2) that the App Store "is the biggest launch of my career."  Motion at 16.  Affinity's

12  selective quotation from the witness's deposition misleadingly obscures that his testimony

13  fully answered Affinity's questions and was completely consistent with Mr. Jobs'

14  statements.   Affinity does not explain how the testimony about Mr. Jobs' statement is

15  deficient, let alone why it justifies Affinity taking Mr. Jobs' deposition.  Affinity also fails to

16  mention that when asked why Mr. Jobs said the App Store was a "grand slam," another

17  Apple witness also provided testimony consistent with Mr. Jobs' statement, as confirmed by

18  this Court's reading of that testimony.

19      And far from disputing Mr. Jobs' comment (PS2) that the App Store was the biggest

20  launch of Mr. Jobs' career, the witness simply corrected Affinity's mischaracterization and

21  clarified that Mr. Jobs said, "[t]his is the biggest launch of my career" and not, "The App

22  Store is the biggest launch of my career."

23      Affinity also argues that a deposition of Mr. Jobs is necessary because the witness

24  suggested that the quote might not be accurate.  Motion at 16, fn 5.  But if Affinity ever had

25  any doubt about the accuracy of any of Mr. Jobs' statements, it could have propounded

26  requests for admissions.  Affinity failed to exercise this less intrusive method of discovery.

27  Despite claiming that Mr. Jobs statement is solely relevant to the damages issue of whether

28  the App Store drives sales of the iPhone, Affinity did not ask Apple's Rule 30(b)(6) witness

on financial topics a single question about Mr. Jobs' statements.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Affinity also argues that it needs to depose Mr. Jobs about a statement (PS4) made during Apple's October 2008 earnings call regarding the App Store.  Motion at 6.  Witness C, however, already answered Affinity's question about the statement, and furthermore, Affinity's Motion fails to identify any deficiency in the witness's testimony about the statement, let alone a disavowal or contradiction of Mr. Jobs' statement.

      **f.**          **Affinity received sufficient testimony regarding Apple's litigation against HTC (PS16-17).**

Affinity does not attempt to show that other discovery has been insufficient on Mr. Jobs' two statements regarding Apple's litigation against HTC, although Affinity maintains its request to depose Mr. Jobs on those statements.  Motion at 19.  Nor does Affinity offer any explanation of how such statements might be relevant to this litigation.  These statements were made when Apple filed actions on March 2, 2010 in the U.S. International Trade Commission and in Delaware against cell phone competitor HTC for infringing a total of 20 Apple patents.  If a general statement about patent rights could be used as the basis to depose a CEO, the apex rule would be meaningless with respect to technology companies, whose executives often make statements about the importance of protecting their intellectual property.

Witness B's testimony differs dramatically from the testimony presented in *Paice*, in which Toyota witnesses denied any involvement in crafting the public statements or press releases of the COO and took positions that directly contradicted the statements by their COO.  The situation is also different than the one in *First United Methodist Church of San Jose v. Atlantic Mutual Ins. Co.*, 1995 WL 566026, at *2-3 (N.D. Cal., Sept 19, 1995).  In *First United Methodist*, the court permitted the deposition of Atlantic Mutual's president based on the president's personal knowledge of the plaintiff's insurance program and personal involvement in the decision to stop insuring plaintiffs.  In this case, however, there is no suggestion that Mr. Jobs has any knowledge of Affinity, its owners or the Patents-In-Suit.

United States District Court

For the Northern District of California

1    Most importantly, Affinity's Motion fails to identify any additional information it needs

2    from Mr. Jobs that it has not already learned from the depositions of Apple witnesses, or

3    that it could have learned through written discovery.

4        **IV.    Analysis**

5        "A party seeking to prevent a deposition carries a heavy burden to show why

6    discovery should be denied." *Websidestory, Inc. v. Netratings, Inc.*, C06cv408, 2007 WL

7    1120567 *2 (S.D.Cal., Apr.6, 2007). When a party seeks the deposition of a high-level

8    executive (a so-called "apex" deposition), the court may exercise its discretion under the

9    federal rules to limit discovery. See *id.*; Fed. R. Civ. P. 26(b)(1)-(b)(2). In determining

10   whether to allow an apex deposition, courts consider (1) whether the deponent has unique

11   first-hand, non-repetitive knowledge of facts at issue in the case and (2) whether the party

12   seeking the deposition has exhausted other less intrusive discovery methods.

13   *Websidestory, Inc.*, 2007 WL 1120567 at *2. Absent extraordinary circumstances, it is very

14   unusual for a court to prohibit the taking of a deposition. *Id.* Additionally, "when a witness

15   has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO

16   is subject to deposition." *Id.* A claimed lack of knowledge, by itself, is insufficient to preclude

17   a deposition. *Id.* "Moreover, the fact that the apex witness has a busy schedule is simply

18   not a basis for foreclosing otherwise proper discovery." *Id.*

19       That said, "Virtually every court that has addressed deposition notices directed at an

20   official at the highest level or 'apex' of corporate management has observed that such

21   discovery creates a tremendous potential for abuse or harassment." *Celerity, Inc. v. Ultra*

22   *Clean Holding, Inc.*, No. C05-04374 MMC (JL), 2007 WL 205067 *3 (N.D.Cal., Jan.25,

23   2007).

24       For that reason, parties seeking to depose a high ranking corporate officer must first

25   establish that the executive (1) has unique, non-repetitive, firsthand knowledge of the facts

26   at issue in the case, and (2) that other less intrusive means of discovery, such as

27   interrogatories and depositions of other employees, have been exhausted without success.

28   *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979). "Where a high-level decision

United States District Court

For the Northern District of California

1  maker 'removed from the daily subjects of the litigation' has no unique personal knowledge

2  of the facts at issue, a deposition of the official is improper." *Id.* (quoting *Baine v. General*

3  *Motors Corp.*, 141 F.R.D. 332, 334 (M.D.Ala.1991)). "This is especially so where the

4  information sought in the deposition can be obtained through less intrusive discovery

5  methods (such as interrogatories) or from depositions of lower-level employees with more

6  direct knowledge of the facts at issue." *Id.*

7       Affinity misstates the standard for deposing a CEO, claiming it is sufficient to show

8  that Mr. Jobs has "firsthand knowledge of relevant information." Affinity relies on a decision

9  from the San Jose division of this district, in the *Apple iPod iTunes Antitrust Litigation*, C.A.

10  No. C05-00037 JW (HRL), D.I. 543 (N.D.Cal. Mar. 21, 2011). However, Magistrate Judge

11  Howard R. Lloyd designated the decision as "Not for Citation," under Civil Local Rule 3-

12  4(e).

13       Civil Local Rule 3-4(e), Prohibition of Citation to Uncertified Opinion or Order

14  provides:

15      Any order or opinion that is designated: "NOT FOR CITATION," pursuant to Civil
16      L.R. 7-14 or pursuant to a similar rule of any other issuing court, may not be cited to
       this Court, either in written submissions or oral argument, except when relevant
17      under the doctrines of law of the case, res judicata or collateral estoppel.

18       Affinity fails to indicate how its citation falls into any of the designated exceptions.

19  Although Jobs' deposition was at issue in the *Apple iTunes Antitrust Litigation*, that is not

20  enough to make the decision to permit a limited deposition of Mr. Jobs in that case does

21  not amount to law of the case, res judicata, or collateral estoppel in this case. Accordingly,

22  the Court finds that Affinity improperly cited this decision, which doesn't really help its

23  cause anyway. Judge Lloyd expressly rejected the same theory which Affinity proffers in

24  this case: that a CEO's firsthand knowledge of his own public statements justifies the

25  CEO's deposition.

26       Here, Affinity cannot meet its burden to show that Mr. Jobs has "unique" and

27  "non-repetitive" knowledge regarding any relevant topic that is not available through less

28  burdensome means. Affinity does not even try to contend that Mr. Jobs has any knowledge

   of Affinity, its patents, the inventors of those patents, or infringement by Apple products.

**United States District Court**
For the Northern District of California

1   Instead, based only on Mr. Jobs' public statements regarding Apple products or other

2   patents or lawsuits, Affinity asks the Court to conclude that Mr. Jobs has relevant firsthand

3   knowledge that entitles Affinity to depose him. But Apple has never denied that Mr. Jobs

4   made the statements attributed to him in Apple press releases or presentations. And Apple

5   has produced witnesses with firsthand knowledge of the statements Affinity has identified

6   and the surrounding circumstances. Nor has Affinity even claimed that Jobs' statements

7   run counter to the statements of Apple's witnesses, as discussed in the *Paice* case, on

8   which Affinity relies to justify Jobs' deposition. *Paice, LLC v. Toyota Motor Corp.*, C.A.

9   No.2:07-CV-180 DF (E.D.Tex. Sept. 6, 2006) (Ex. 42 to Declaration of Matthew Gaudet).

10      In the course of its questioning Affinity tried to maneuver the witnesses into

11   contradicting Jobs' statements, but they didn't do it. What the witnesses may have done is

12   disagree with Affinity's interpretation or paraphrasing of Jobs' statements. That does not

13   amount to justification for deposing Jobs and then arguing with him over what he meant,

14   the way Affinity's counsel did with the Apple witnesses.

15      The mere fact that Jobs made public statements, even on issues that Affinity

16   considers relevant to its claims, are insufficient to justify his deposition. Courts have

17   repeatedly denied apex depositions even on a showing that the executive made public

18   statements on relevant issues. *Mulvey, id.*, 106 F.R.D. at 366 (rejecting plaintiffs' request to

19   depose Lee Iacocca based on public statements he made relevant to Chrysler's liability,

20   and instead requiring plaintiffs to submit written interrogatories in the first instance); *Salter*,

21   593 F.2d at 651 (5th Cir. 1979) (upholding district court's decision to vacate the deposition

22   date of Upjohn's president, Dr. William Hubbard, where Dr. Hubbard had even given

23   testimony before the United States Senate concerning the testing, marketing and use of the

24   drug on which the plaintiff's claim was based); *Thomas v. IBM*, 48 F.3d 478, 483 (10th Cir.

25   1995) (granting a protective order barring the deposition of IBM chairman John Akers even

26   though he allegedly "authored an IBM policy designed to discriminate against older

27   employees."); see also *Celerity, Inc.*, 2007 WL 205067, at *5 (refusing to permit deposition

28

**United States District Court**

For the Northern District of California

1   to go forward based on plaintiffs' claims that executives "participated" in relevant events

2   where knowledge was not unique to those executives).

3          Apple also contends that Mr. Jobs' deposition should not be allowed because Affinity

4   has used all of its allotted deposition time. (Opp. p.24). Affinity opposes this contention on

5   grounds that Apple forced Affinity to depose multiple "substitute witnesses" as a predicate

6   to deposing Mr. Jobs, and now that Affinity has done so, Apple argues that "time is up."

7   Affinity denies that it exceeded its deposition time limits, and even if it did, then additional

8   time would be appropriate specifically for this deposition. (Footnote 12 to Affinity's Reply

9   brief restates the argument it previously made before this Court). This Court expressly

10  found that it could not render a decision on the merits of Apple's arguments relating to

11  Affinity's use of deposition hours, which Affinity disputed. (D.I. 134 at p.2 (". . . [T]his

12  dispute exceeds the scope of the referral to this Court.")). The Court noted that "[t]he

13  parties' appropriate course of action is to seek a decision by Judge Wilken whether the

14  deposition cap has been exceeded. . . ." (*Id.*). Apple never sought a decision from Judge

15  Wilken because the parties entered into a stipulation allowing Affinity to conduct additional

16  depositions. (D.I. 139). Thus, a decision on whether Affinity exceeded its allotted deposition

17  hours has not been made.

18         Finally, Affinity argues that Apple incorrectly alleges that Affinity deposed Creative.

19  (Opp. p.25). In fact, Affinity claims it was Apple who scheduled the Creative Deposition.

20  (Gaudet Decl. II ¶8). Affinity simply attended Apple's deposition and cross-examined the

21  witness.

22         **V.    Conclusion and Order**

23         In this case, Affinity fails to show that Steve Jobs has unique and personal

24  knowledge of facts relevant to this litigation, which cannot be obtained through less

25  intrusive discovery, for example, interrogatories, requests for admissions, or other

26  depositions. Accordingly, Affinity's motion to compel the deposition of Steve Jobs is denied

27  and Apple's motion for protective order is granted.

28         IT IS SO ORDERED.

1    DATED: May 9, 2011

2                                          _____
3                                                   JAMES LARSON
                                           United States Magistrate Judge
4

5

6    G:\JLALL\CASES\CIV-REF\09-4436\Order-short re 148.wpd

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28